EXHIBIT A

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARIA AGNE, on her own behalf and on behalf of other similarly situated persons,

Plaintiff,

v.

PAPA JOHN'S INTERNATIONAL, INC., et al.,

Defendants.

Case No. 2:10-cv-01139-JCC

**SUPPLEMENTAL DECLARATION OF ALBERT H. KIRBY IN OPPOSITION TO DEFENDANT JTF ENTERPRISES, INC.'S MOTION TO DISMISS**

I, Albert H. Kirby, declare as follows:

1.      I am an attorney of record for Plaintiff Maria Agne in this action. I am over the age of 18 years. I am competent to testify as to the matters stated herein. I make this declaration based upon my own personal knowledge.

2.      The deposition of Defendant Kevin Sonneborn took place on January 23, 2012. I received a copy of the transcript for this deposition on February 1, 2012. Attached as *Exhibit 7* are excerpts from the transcript of Mr. Sonneborn's deposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Dated this 3rd day of February 2012 in Seattle, Washington.

*/s/ Albert H. Kirby*
Albert H. Kirby, WSBA #40187

**KIRBY LAW GROUP**
93 S. Jackson St. #63230
Seattle, WA 98104-2818
Ph: (206) 414-9950
Fax: (866) 845-6302

EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT

 2             WESTERN DISTRICT OF WASHINGTON

 3                      AT SEATTLE

 4      _____

 5    MARIA AGNE, on her own behalf )
      and on behalf of other        )
 6    similarly situated persons,    )
                                     )
 7            Plaintiff,             )
                                     )
 8            vs.                    )  No. 2:10-cv-01139-JCC
                                     )
 9    PAPA JOHN'S INTERNATIONAL,     )
      INC., a Delaware corporation, )
10    et al.,                        )
                                     )
11            Defendants.            )

12      _____

13             DEPOSITION UPON ORAL EXAMINATION

14                           OF

15                    KEVIN SONNEBORN

16      _____

17                      9:50 A.M.

18                  JANUARY 23, 2012

19            1325 FOURTH AVENUE, SUITE 540

20               SEATTLE, WASHINGTON

21

22

23

24    REPORTED BY: CHERYL L. O'HALECK, CCR No. 2226

25
```

```
 1   EXHIBITS FOR IDENTIFICATION                        PAGE

 2     8   12/17/2007 Papa John's Loyalty Program        49

 3         Franchise Agreement, Standard Restaurant,

 4         for Rain City Pizza, LLC, Store No. 3498

 5     9   October 2009 PowerPoint presentation, the     79

 6         first page of which has the title, "Target,

 7         Picture Text, and Sell"

 8    10   10/28,2009 email to Mike Frizzell, et al.,     80

 9         from Jennifer Fry, Subject: Setting up

10         Picture Mail Account; SPJ 000235

11    11   String of email, the top one of which is       82

12         dated 10/28/2009 to Mike Frizzell from

13         Robert Wisnovsky, Subject: Re: Jim's Numbers

14         This Week; SPJ 000236 - 000237

15    12   11/2/2009 email to Mike Frizzell and Robert    85

16         Wisnovsky from Jennifer Fry, Subject: Calls

17         for this weekend; SPJ 000238

18    13   String of email, the top one of which is       85

19         dated 11/4/2009 to Mike Frizzell from

20         Jennifer Fry, Subject: Re: Upcoming texting;

21         SPJ 000239.

22    14   String of email, the top one of which is       86

23         dated 11/18/2009 to Jennifer Fry and Robert

24         Wisnovsky from Mike Frizzell, Subject: RE:

25         Upcoming texting; SPJ 000240 - 000241
```

1              SEATTLE, WASHINGTON; JANUARY 23, 2012

2                         9:50 A.M.

3                         --oOo--

4

5                      KEVIN SONNEBORN,

6       sworn as a witness by the Certified Court Reporter,

7                   testified as follows:

8

9                       EXAMINATION

10   BY MR. HEYRICH:

11       Q.   Good morning, Mr. Sonneborn.  Did I pronounce

12   that correctly?

13       A.   That's right.

14       Q.   Donald Heyrich.  We met just a moment ago.

15   I'm one of the attorneys for Maria Agne in her lawsuit.

16   And we're here to take your deposition in connection

17   with that case.  Is that your understanding?

18       A.   Yes.

19       Q.   What's your professional address?

20       A.   15311 Northeast 90th Street in Redmond,

21   Washington.

22       Q.   Have you been deposed before?

23       A.   Yes.

24       Q.   How many times?

25       A.   Just once.

 1    right?

 2              MR. HEYRICH:  Thank you.

 3              MR. LAWRENCE:  If you understand the question,

 4    you can go ahead and answer.

 5         A.   No.

 6         Q.   (BY MR. HEYRICH:)  I'd like to talk about your

 7    business so we can understand the entities involved and

 8    how it's structured, okay?

 9              Can you list off for me any Papa John's

10    entities in which you have ownership?  And I'm not

11    talking about locations of stores right now, but -- I

12    mean, there is Rain City Pizza, Rose, and so forth,

13    those kinds of things.  So the question is what Papa

14    John's entities do you have an ownership in?

15         A.   Do you want to break that down for me and ask

16    me some questions?

17         Q.   What businesses do you own that do any

18    business with Papa John's?

19         A.   Seattle PJ Pizza, LLC houses 18 Papa John's.

20         Q.   Sorry.  Can you say that again, please?

21         A.   Seattle PJ Pizza, LLC houses 18 Papa John's

22    that are in the Seattle and peninsula area.

23         Q.   What is the term "houses 18 Papa John's"?  Is

24    that a separate business?  I didn't quite understand.

25              MR. LAWRENCE:  You mean operate, is that what

1    you mean?

2              THE WITNESS:  Operate.

3         Q.   (BY MR. HEYRICH:)  Oh, okay.  Do you have

4    ownership in any other business entity that does

5    business with PJI?

6         A.   Yes.  We also have Rose City Pizza, LLC, which

7    operates eleven stores in the Portland slash Vancouver

8    area.

9         Q.   Any others?

10        A.   There is an entity, PJ Sound Pizza, LLC that

11   houses nine stores in the Everett/Snohomish County area.

12        Q.   Any others?

13        A.   Rain City Pizza, LLC has no stores, doesn't

14   operate any stores.  The only transaction in Rain City

15   Pizza is a loan that we had with two of our previous

16   partners.  So it only contains loan transactions.

17        Q.   Any others?

18        A.   PJ Sound Pizza is a -- is the only member in

19   an entity titled Papa Washington, LLC.  Papa Washington,

20   LLC represents my interest in 50 percent of Seattle PJ

21   Pizza and owns 100 percent of PJ Sound Pizza.  It

22   doesn't directly operate stores.

23        Q.   Are there any other business entities that

24   you're involved in that do business with Papa John's in

25   any way?

1          A.    Seattle PJ Pizza.

2          Q.    And what's his area?

3          A.    Currently, he oversees all of the Seattle

4     stores.

5          Q.    You're familiar with a company called

6     On Time 4 U, are you not?

7          A.    Yes.

8          Q.    How did you first learn of On Time 4 U?

9          A.    In the fall of 2009, my best recollection is

10    there were conversations amongst other franchisees about

11    the program that online -- On Time 4 U was promoting.

12          MR. HEYRICH:  Could you please read that

13    answer back?

14          THE COURT REPORTER:  "Answer:  In the fall of

15    2009, my best recollection is there were conversations

16    amongst other franchisees about the program that online

17    -- On Time 4 U was promoting."

18          Q.    (BY MR. HEYRICH:)  Who was involved in these

19    conversations that you're aware of?

20          A.    Jim Fry, a gentleman by the name of Rick

21    Mohler.

22          MR. LAWRENCE:  How do you spell his last name?

23          THE WITNESS:  M-O-H-L-E-R.

24          Q.    (BY MR. HEYRICH:)  What's Mr. Mohler's -- how

25    is he connected with these conversations?  Is he a

1    franchisee?

2         A.   He's a franchisee.

3         Q.   Do you know where his franchises are?

4         A.   Montana.

5         Q.   Any other franchisees that you remember being

6    involved in these conversations in the fall of 2009?

7         A.   Those are the only two that I recall.

8         Q.   Was Mr. Stepusin involved in these

9    conversations at all, to your recollection?

10        A.   To my recollection, he was not.

11        Q.   How did you get involved in these

12   conversations?

13        A.   After I heard the topic, Mike Frizzell pursued

14   more information.

15        Q.   And how did you hear about it?

16        A.   I had overheard the conversation earlier, and

17   I asked Mike to go get more information about the

18   program.

19        Q.   Where was this conversation that you

20   overheard?

21        A.   I don't recall exactly.  I believe it was in

22   our offices.

23        Q.   Was Mr. Fry in your office, Jim Fry?

24        A.   Yes.

25        Q.   And was Mr. Mohler in your office?

1       A.    Yes.

2       Q.    And Mr. Fry was speaking with Mr. Mohler,

3   correct?

4       A.    That is correct.

5       Q.    And you overheard the conversation?

6       A.    That is correct.

7       Q.    And that's how you first became aware of text

8   message marketing?

9       A.    Yes.

10      Q.    Did you talk with Mr. Frizzell -- did you send

11  him an email in writing communicating with him, or was

12  this a conversation where you instructed him to get more

13  info?

14      A.    This was a conversation.

15      Q.    Did you tell him how to go about obtaining

16  more information?

17      A.    I don't recall how I asked him to get more

18  information.

19      Q.    Did he obtain more information?

20      A.    Yes.

21      Q.    How do you know that?

22      A.    Because he came back to me and recommended a

23  test.

24      Q.    Who did he talk to before he recommended a

25  test?

```
 1              MR. GUNTER:  Objection; foundation.

 2        A.   I'm not sure who he talked to.

 3        Q.   (BY MR. HEYRICH:)  Is Mr. Fry affiliated with

 4   On Time 4 U?

 5              MR. GUNTER:  Objection; form, foundation.

 6        A.   I don't know the answer to that.

 7        Q.   (BY MR. HEYRICH:)  The conversation that

 8   you've described, did you hear the name On Time 4 U?

 9        A.   Yes.

10        Q.   And so that would have been this conversation

11   with Mr. Mohler and Mr. Fry?

12        A.   Uh-huh.

13              MR. GUNTER:  That is a yes?

14              THE WITNESS:  Yes.

15        Q.   (BY MR. HEYRICH:)  And do you understand

16   Mr. Frizzell to then have contacted On Time 4 U for more

17   information?

18              MR. GUNTER:  Objection.

19        A.   I don't know the answer to that.  I don't know

20   where Mike got the information.

21        Q.   (BY MR. HEYRICH:)  What information did he

22   convey to you about text message marketing?  And by

23   "he," I mean Mr. Frizzell.

24        A.   He conveyed that we could do a test of six

25   stores.
```

1    Q.    Anything else?

2    A.    He wanted to try it.

3    Q.    What was the benefit to your business of

4    trying it, if any?

5    A.    If the program worked, then our sales would

6    increase.

7    Q.    Now, you've talked about Mr. Fry in the past,

8    right?  We discussed that earlier.

9    A.    (Witness nods head.)

10   Q.    Does Mr. Fry own any Papa John's franchises,

11   to your knowledge?

12   A.    To my knowledge, he does own franchises.

13   Q.    Those are in southern Oregon I believe,

14   correct?

15         MR. GUNTER:  Objection.

16   A.    I believe so.

17   Q.    (BY MR. HEYRICH:)  Was Jim Fry encouraging the

18   use of text message marketing when he was in this

19   conversation with Mr. Mohler?

20         MR. GUNTER:  Objection.

21   A.    Mr. Fry endorsed the program.

22   Q.    (BY MR. HEYRICH:)  Had he already done some by

23   this time, to your knowledge?

24         MR. GUNTER:  Objection; foundation.

25   A.    I don't know.  I don't know the answer to

1    that.  It is my belief that he did.

2         Q.   (BY MR. HEYRICH:)  Did he discuss his

3    experience with text message marketing, at that time?

4         A.   The gist of the conversation between

5    Mr. Mohler and Mr. Fry was that it was an effective

6    tool.

7         Q.   How were you involved in text message

8    marketing from the time that you had this conversation

9    with Mr. Frizzell forward in 2009?

10             MR. LAWRENCE:  Now you mean personally?

11        Q.   (BY MR. HEYRICH:)  Yes, personally.  Were you

12   involved at all, in any way?

13        A.   Acting on behalf of Seattle PJ Pizza and Rose

14   City Pizza, I viewed my role as one to assess its

15   effectiveness, if it was a program we wanted to

16   continue.

17        Q.   How did you go about assessing its

18   effectiveness?

19        A.   We tested six stores.  I used the coupon

20   redemption report to gauge the effectiveness of the

21   plan.

22        Q.   What sort of data did you use to gauge its

23   effectiveness from those reports?

24        A.   The coupon redemption report tells you the

25   numbers that were used and it tells you the sales that

1          MR. HOWARD:  Anyway, we can discuss that

2    later.

3          Q.   (BY MR. HEYRICH:)  Have you ever attended a

4    presentation put on by anyone affiliated with

5    On Time 4 U where there was a PowerPoint shown?

6          A.   I don't recall ever being at a presentation

7    with this PowerPoint.

8               (Deposition Exhibit 10 was marked for

9               identification.)

10         Q.   (BY MR. HEYRICH:)  We received a number of

11   emails where your name is listed at the top.  Do you see

12   your name at the top of the first page of Exhibit 10?

13         A.   Uh-huh.

14         Q.   Do you know why your name appears there in

15   this document?

16         A.   When I was asked to get this information, I

17   arranged to have access to Mike Frizzell's email so that

18   I could access the information.

19         Q.   How did you obtain access to Mike Frizzell's

20   email?

21         A.   A gentleman by the name of Paul Wichelmann

22   handles our network, and I asked him to set it up.

23         Q.   What is a POS system?

24         A.   A POS system is the computer system that's in

25   the stores.  That's how you manage the day-to-day

1          A.    His name is Peter Ogg.

2          Q.    And how did you learn that Mr. Mohler had

3     apparently used On Time 4 U?

4          A.    He wanted to try to start his own texting

5     program and asked me if I was interested.

6          Q.    And I take it Jim Fry reported -- talked to

7     you about his own experience, is that correct?

8          A.    On occasion, he did.

9          Q.    Have you heard of any other franchisee using

10    On Time 4 U for text marketing?

11         A.    Just those.

12         Q.    In Mr. Stepusin's comments when you were

13    discussing your results and he mentioned other

14    franchisees, was he specific at all?

15         A.    The only part of his comment that I remember

16    was that he said other Northwest franchisees.

17               (Deposition Exhibit 12 was marked for

18               identification.)

19         Q.    (BY MR. HEYRICH:)  Just looking at Exhibit 12,

20    is this an email that you pulled from your company's

21    email files?

22         A.    Yes, it was.

23               (Deposition Exhibit 13 was marked for

24               identification.)

25         Q.    (BY MR. HEYRICH:)  Do you have Exhibit 13?

1     A.    I do.

2     Q.    Is this an email that you pulled from your

3     company's email files?

4     A.    Yes.

5     Q.    At the time that Mr. Frizzell was engaged in

6     collecting the data necessary for On Time 4 U to engage

7     in text message marketing, were you aware of his

8     activities, Mr. Frizzell's activities?

9            MR. LAWRENCE:  Object to the form.

10    A.    I knew that he was trying to put together the

11    test.

12    Q.    (BY MR. HEYRICH:)  One question.  The email

13    says, "Jim put together a step-by-step instruction sheet

14    that might eliminate the need for a conference call.

15    I'm attaching it here."

16           We didn't receive any attachment.  Did you?

17    A.    I don't remember if there was an attachment or

18    not.

19    Q.    Do you still have a copy of this email in

20    electronic form?

21    A.    Yes.

22           (Deposition Exhibit 14 was marked for

23           identification.)

24    Q.    (BY MR. HEYRICH:)  Looking at Exhibit 14, is

25    this an email that you've obtained from your company's

1   email files?

2        A.   Yes, it is.

3        Q.   Do you understand it to be communications

4   between Mr. Frizzell and representatives of On Time 4 U?

5        A.   Yes, I do.

6        Q.   Do you have a copy of this email in electronic

7   form?

8        A.   Yes, I do.

9        Q.   Like the last one, there is a reference to an

10  attachment.  We'll follow up on that.

11            (Deposition Exhibit 15 was marked for

12            identification.)

13       Q.   (BY MR. HEYRICH:)  Looking at Exhibit 15, is

14  this a document that you obtained from your company's

15  email files?

16       A.   Yes, it is.

17       Q.   Do you understand it to be communications

18  between Mr. Frizzell and representatives of On Time 4 U?

19       A.   Yes, I do.

20            (Deposition Exhibit 16 was marked for

21            identification.)

22       Q.   (BY MR. HEYRICH:)  Handing you Exhibit 16, is

23  this a document you obtained from your company's email

24  files?

25       A.   Yes, it is.

1          Q.    Now, you don't recall these specific

2    complaints I understand, is that right?

3          A.    That's correct.

4          Q.    Do you recall, in general, complaints coming

5    in at the time you were doing the testing in 2009?

6          A.    I don't recall getting complaints in 2009.

7          Q.    If you were to receive complaints like this,

8    is it your practice to give them attention?  I mean, you

9    wouldn't completely ignore it, right?

10         A.    I don't respond to the complaints.

11         Q.    Do you read them?

12         A.    I don't even read every complaint.  The

13   operating -- the area managers respond to the complaints

14   and the marketing person responds to the complaints.

15         Q.    Does Mr. Stepusin ever get involved in the

16   complaints, or has he?

17         A.    I don't know the answer to that.

18         Q.    I just wanted to clarify a couple of things.

19   When we use the initials "PJI," we're referring to Papa

20   John's International, Inc., right?

21         A.    That's correct.

22         Q.    You mentioned a meeting with Jim Fry in person

23   in your office.  Are we talking about your office in

24   Redmond?

25         A.    Yes.

1     Q.   Do you know if the texts went out to the

2  Greenwood store?

3     A.   I can't recall the redemption for every store

4  off the top of my head.

5     Q.   And what would the redemption tell you?

6     A.   If people used it.

7     Q.   How many stores operated by the businesses you

8  own had text messages sent on its behalf?

9          MR. LAWRENCE:  Excuse me.  Could I have that

10  back?

11          MR. HEYRICH:  Sorry.

12          MR. LAWRENCE:  Yeah, I thought it was just me.

13     Q.   (BY MR. HEYRICH:)  So text messages were sent

14  by On Time 4 U on behalf of your stores, correct?  And

15  by "your," I mean stores owned by your companies.

16          MR. LAWRENCE:  Could you read that back,

17  please?

18          THE COURT REPORTER:  "Question:  So text

19  messages were sent by On Time 4 U on behalf of your

20  stores, correct?  And by "your," I mean stores owned by

21  your companies."

22          MR. LAWRENCE:  Misstates his testimony.

23          You can answer.

24     A.   As I said before, I submitted information for

25  Wisnovsky to have the ability to send out texts.

1    Several of the stores that I submitted information for

2    had zero redemptions.  So I can't come to the conclusion

3    that he sent out texts for all the stores that I

4    submitted.

5         Q.   (BY MR. HEYRICH:)  How many stores did you

6    submit data for?

7              MR. LAWRENCE:  And "you" being the company?

8              MR. HEYRICH:  Yeah, I'm sorry.

9              MR. LAWRENCE:  That's okay.

10        A.   I believe the total was between 11 and 13.

11             MR. LAWRENCE:  And again, excuse me, this is

12   April of 2009?

13             THE WITNESS:  Yes.

14        Q.   (BY MR. HEYRICH:)  I'm sorry.  So the 11 to 13

15   stores in April 2009 --

16        A.   I'm sorry.  I was counting some stores from

17   November.  There were six stores in November, there was

18   eleven stores in April.

19        Q.   To your knowledge, did any one store have more

20   than one time when text messages were sent by

21   On Time 4 U?

22        A.   I don't recall if there were multiples for

23   individual stores.

24        Q.   How would we figure that out, if we wanted to

25   piece together what stores had messages sent and which